IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Janice K.  Barton,                                    ) | Civil Action No.  6:05-0722-RBH-WMC |
|               Plaintiff,      ) | |
|                  ) | **REPORT OF MAGISTRATE JUDGE** |
|       vs.                                       ) | |
|                  ) | |
| Jo Anne B. Barnhart,                             ) | |
| Commissioner of Social Security,         ) | |
|                  ) | |
|           Defendant.      ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB") or supplemental security income benefits ("SSI").

## ADMINISTRATIVE PROCEEDINGS

On June 19, 2002, the plaintiff filed applications for DIB and SSI alleging disability beginning January 1, 1996.  The applications were denied initially and on reconsideration. On August 13, 2003, the plaintiff requested a hearing, which was held on

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

August 12, 2004.  Following the hearing, at which the plaintiff, her attorney and a vocational expert appeared, the administrative law judge considered the case *de novo*, and on October 21, 2004, determined that the plaintiff was not entitled to benefits.   This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on February 4, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

(1)    The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through September 30, 2003, but not thereafter.

(2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)    The claimant's major depressive and anxiety disorders are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

(4)    These medically determinable impairments do not meet, equal, or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4 and 16.

(5)    The claimant's allegations, statements, and testimony regarding her limitations and other subjective symptoms are not totally credible to the extent alleged for the reasons set forth in the body of the decision. Her allegations of bad nerves, arthritis in both feet, migraine headaches, depression, an inability to interact with people, and anxiety occurring with such frequency and severity as to preclude all substantial gainful activity are not supported by the overall evidence of the record.

(6)    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the [claimant's] impairments (20 CFR 404.1527 and 416.927).

(7)    Considering the claimant's combination of severe and nonsevere impairments, she has the residual functional capacity to perform the physical requirements of work at all exertional levels with restrictions which require no jobs that require the completion of more than simple instructions and no working directly with the general public.

2

(8)     The claimant's past relevant work as a office cleaner, house cleaner, cloth warehouse worker, and fishing lure machine operator do not require the performance of work related activities precluded by the above limitations set forth in Finding No. 7 (20 CFR 404.1565 and 416.965).

(9)     The claimant was not under a "disability" as defined in the Social Security Act, at any time on or prior to her date last insured expired, September 30, 2003, or through the date of this decision.

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled

3

at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct

4

a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 38 years old as of the alleged onset date of disability, January 1, 1996, and 47 years old as of the date of the ALJ's decision, October 24, 2004 (Tr. 82). She has a high school education (Tr. 94), and worked in the vocationally relevant past as a sandwich maker, kitchen helper, and cloth warehouse worker[2] (Tr. 54-56, 105-12). She alleges disability due to bad nerves, arthritis in both feet, migraine headaches, depression, inability to interact with people, and anxiety (Tr. 88). She was last insured for purposes of eligibility for disability insurance benefits on September 30, 2003 (Tr. 13).

The record does not contain any medical evidence dated prior to 2000, four years after her alleged onset of disability date.[3]

On January 7, 2000, the plaintiff presented to Baptist Medical Center and underwent a CT scan of the head after complaining of severe headaches and dizziness.

---

[2]After her alleged onset date, the plaintiff worked for brief periods of time as a cashier, cook, house/office cleaner, and fishing lure machine operator, and last worked in June 1998 (Tr. 54-56, 105-12). These were determined to be unsuccessful work attempts, and the Agency found the plaintiff had not performed substantial gainful activity since January 1996 (Tr. 101).

[3]Medical records dated between 2000 and 2004 indicated the plaintiff had a history of bilateral heel spur surgery in the early 1980s, treatment for migraine headaches in 1992, treatment for depression in 1994, and right carpal tunnel release surgery in 1995 (Tr. 152-53).

Results of the scan were normal (Tr. 140-41). The record does not indicate that she sought or received any further medical treatment until October 2000, a period of nine months.

On October 5, 2000, the plaintiff presented to the Lexington Medical Center Swansea urgent care clinic for treatment of a sore throat and migraine headache. She was diagnosed with an inflamed throat, sinusitis and headache that was probably secondary to the sinusitis. She was encouraged to undergo a complete physical for evaluation of her headaches (Tr. 178-80).

The record does not indicate that she sought or received any further medical care until August 8, 2001, a period of 10 months, at which time she received treatment for elbow pain after her husband hit her with his walking stick. An x-ray of her right elbow was negative (Tr. 175-77).

On December 4, 2001, the plaintiff presented to the urgent care clinic with symptoms of depression and anxiety. On examination, she was in no apparent distress, and was provided with samples of Paxil (Tr. 173). Three weeks later, she reported that Paxil seemed to help her symptoms. Her diagnoses at that time were depression, improved on Paxil, and menstrual cramps (Tr. 171).

In May 2002, the plaintiff received treatment for an upper respiratory infection and infected fingernail (Tr. 168). In September 2002, she was treated for acute sinusitis with earache and vertigo (Tr. 166).

On September 23, 2002, the plaintiff presented to Dr. W.C. Floyd for a consultative examination in connection with her application for benefits. She reported seeing a psychiatrist for depression in 1994 and receiving medication, and said she stopped taking the medication on her own and had not seen a psychiatrist since then. The plaintiff reported currently having zero to four panic attacks per week, which occurred primarily when she was in traffic or in public places. She also reported having migraine headaches since 1992, which lasted up to one week at a time and were associated with nausea and

6

vomiting.  She reported that over-the-counter Excedrin helped ameliorate her headaches, and that prior prescription medications such as Imitrex did not help.  The plaintiff also reported bilateral ankle and foot pain with occasional swelling after prolonged standing, but she said she did not take medication for it.  On examination, the plaintiff was very anxious but in no acute distress.  When asked why she could not work, she stated that she could not deal with people/  Physical examination was unremarkable, and the plaintiff had normal strength and range of motion with no motor or sensory deficits.  Mental status examination demonstrated that the plaintiff was fully oriented, with grossly intact memory and normal thought processes and intelligence.  She appeared very anxious and exhibited tremors and flinching.  Dr. Floyd noted that she "appear[ed] to be able to manage her daily activities, personal relationships and monetary funds."  He assessed depression with anxiety and panic attacks, and he indicated that the plaintiff would likely benefit from psychiatric follow-up care.  He also assessed migraine headaches and directed the plaintiff to follow up with another physician or neurologist for medication management.  He found no evidence of osteoarthritis on examination or x-ray (Tr. 152-56).

On October 1, 2002, the plaintiff presented to psychiatrist Dr. Thomas V. Martin for a consultative examination in connection with her application for benefits.  She appeared distraught, somewhat childlike in demeanor, guarded and mildly anxious.  In describing her condition, the plaintiff reported that she was intermittently sad, had occasional crying spells and felt helpless at times.  She indicated that she lost her most recent job at a fishing lure company after the company was sold and that she had not returned to work due to marital difficulties.  The plaintiff reported the following daily activities: cooking, cleaning, doing laundry, reading, doing crafts, doing yard work and attending church.  On examination, she was fully oriented but demonstrated poor interpersonal skills.  Her speech was normal, and her mood was mildly anxious.  Her thoughts were goal-directed and coherent. She successfully completed short-term memory,

7

concentration and mathematical measures. Dr. Martin assessed a depressive disorder, not otherwise specified; an anxiety disorder, not otherwise specified; partner relationship problems; immature interpersonal skills; migraine headaches; and psychosocial stressors. He assessed a Global Assessment of Functioning (GAF) score of 55.[4]  He noted that the plaintiff "vocalize[d] motivation for treatment, which is not apparent at this time. [Her] prognosis is fair."  Dr. Martin concluded that the plaintiff would benefit from medication management and psychotherapy, as well as proper pain control measures for her headaches (Tr. 157-60).

On October 25, 2002, State Agency psychologist Dr. Hubert A. Eaker reviewed the plaintiff's records and completed a "Psychiatric Review Technique" form, in which he found the plaintiff's affective and anxiety disorders produced moderate restriction of daily activities; moderate difficulty maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Dr. Eaker then assessed the plaintiff's mental residual functional capacity and found she had, at most, moderate limitations in her ability to do specific work-related activities.  He noted that she might have difficulty attending to detailed work, but that she was able to carry out simple work for more than two hours at a time without special supervision.  Dr. Eaker found that the plaintiff would have "only occasional" work interruptions due to anxiety, that her anxiety would interfere with her ability to deal with the general public, that she was able to accept supervision appropriately, and that she could make necessary occupational adjustments (Tr. 189-203).

---

[4]A GAF score between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (Text revision 2000).

On January 27, 2003, the plaintiff presented to the urgent care clinic with complaints of intermittent right shoulder pain. Examination revealed tendonitis in the right posterior shoulder. She was treated with an analgesic (Tr. 164).

On March 20, 2003, the plaintiff returned to the urgent care clinic with worsening intermittent shoulder pain (Tr. 161-62, 225-26). She denied any injury or heavy lifting (Tr. 161, 225). She also complained of a cough and congestion (Tr. 161, 225). On examination she exhibited right shoulder tenderness to palpation, but had full range of motion except that she was unable to lift it completely over her head (Tr. 161, 225). The attending physician diagnosed right shoulder pain, acute sinusitis and allergic rhinitis. She prescribed allergy medications, directed the plaintiff to take Tylenol for pain, and told her to avoid pushing, pulling or lifting over 10 pounds for one week (Tr. 161-62, 225-26).

The record indicates that the plaintiff attended nine counseling sessions between July 2003 and October 2003. On July 29, 2004, nine months after the completion of the counseling, counselor Catherine L. Ussery, M.A., L.P.C., summarized that over the course of the nine sessions, the plaintiff consistently reported increasing fear and panic symptoms while in traffic and in public places, as well as daily panic attacks. Ms. Ussery indicated that the plaintiff showed short-term memory impairment at least once per session and displayed tangential speech. She noted that it was unclear whether the plaintiff was taking her medications consistently. Ms. Ussery assessed panic disorder with agoraphobia; major depressive disorder, moderate, recurrent; carpal tunnel syndrome; frequent headaches; psychosocial stressors, and a GAF score of 50[5] at the first and last counseling sessions. She opined that the plaintiff

> ... appeared motivated during the first couple of sessions, yet she did not consistently apply new skills in order to show

---

[5]A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* DSM-IV, supra.

> progress toward treatment goals. [She] appeared to be
> handicapped by panic, to the point that she did not want to
> leave her house. Although [her] panic disorder and symptoms
> of depression were causing her great difficulty in daily
> functioning, there appeared to be minimal motivation to discuss
> or apply new skills for decreasing symptoms.

Ms. Ussery indicated that the plaintiff had been referred to a different mental health clinic since she had not paid her bill. The record does not indicate that the plaintiff sought or received any mental health care after her counseling sessions ended in October 2003 (Tr. 207-22).

On March 12, 2004, the plaintiff returned to the urgent care clinic with complaints of bilateral hip and leg pain. On examination, she seemed to favor the right leg (Tr. 224). X-rays subsequently showed no evidence of acute fracture, dislocation, or abnormal calcifications (Tr. 223).

At the administrative hearing on August 12, 2004, the plaintiff had difficulty remembering the exact dates that she performed her past jobs (Tr. 32-37). She testified that in the early 1990s, she worked as a sandwich maker and cashier at a café, a kitchen helper in a restaurant and a cloth inspector in a fabric warehouse (Tr. 32-34). She described the cloth inspector job as involving "[i]nspecting material and pull[ing] it for orders to be shipped out," and testified that she held that job for a couple of years (Tr. 33-34). She testified that after 1996, she worked as a cashier, a cook, a new home cleaner and a mobile home and office cleaner, each of which lasted less than a year (Tr. 34-37).

The plaintiff testified that she became paranoid in traffic, had migraine headaches that confined her to bed, and became very nervous around people (Tr. 38). She said she had a nervous breakdown in 1993 (Tr. 39), a second breakdown for which she could not remember the date (Tr. 40), and a third breakdown in December 2002 (Tr. 38). She said she received medication, but was not hospitalized and missed only a few days of work each time (Tr. 37, 39, 40). When asked if she knew what happened in 1996 to cause

her to become disabled at that time, the plaintiff responded, "No, sir" (Tr. 41). She reported having three to four panic attacks per week, brought on by heavy traffic, lots of people and worrying (Tr. 51). She indicated that she currently took Ibuprofen for pain, Prozac for anxiety and Excedrin Migraine for migraines, all of which helped "sometimes" (Tr. 41-42). She reported having migraine headaches "quite often" and said they sometimes lasted a month (Tr. 42). She later stated the headaches occurred two or three times per month (Tr. 51). She said that Imitrex injections helped a little bit (Tr. 43). The plaintiff reported that she still had pain in her hips, elbow and shoulder (Tr. 43). She estimated that she could walk or stand for 10 minutes at a time and sit for 15 to 20 minutes at a time (Tr. 47). She said she was told not to lift more than 10 pounds (Tr. 48). She said she needed to take at least a half dozen rest periods per day for up to an hour at a time (Tr. 50).

The plaintiff testified that she lived with a friend and was able to care for her personal needs (Tr. 45). She said she rarely drove because traffic made her nervous (Tr. 45). She reported vacuuming, cooking, washing dishes, planting vegetables, walking, doing crafts, going to church sometimes and visiting friends "a couple of times a month" (Tr. 46).

Vocational rehabilitation counselor William W. Stewart, Ph.D., provided expert testimony at the hearing. He provided the exertion and skill level of the plaintiff's past jobs as follows:

- Sandwich maker/cashier – light to medium exertion, "low semi-skilled at the highest level."

- Kitchen helper – light to medium exertion, unskilled.

- Cloth warehouse worker – light to medium exertion, "low semiskilled at the highest level."

- Cashier – light exertion, low semiskilled.

- House cleaner – medium exertion, unskilled.

- Cleaner of mobile homes and offices – light exertion, unskilled.

11

• Fishing lure maker – light exertion, unskilled.

The ALJ asked Mr. Stewart the following hypothetical question:

> . . . I want to take the State agency's doctor's reports, and that is at 5F, page 8. And this is a mental residual functional capacity assessment and the usual form, and I'm going to turn to Section III, functional capacity assessment, and read the narrative there to give you the limitations and abilities. It says,
>
> > Claimant may have difficulty attending to detailed work, but is able to carry out simple work functions for two-plus-hour periods without special supervision. She can attend work adequately, with only occasional work interruptions, secondary to anxiety. Anxiety would . . . interfere . . . with her ability to deal with the general public, but she is able to accept supervision appropriately. She is capable of necessary occupational adjustments.
>
> And that's the only . . . those are the only limitation[s] we are going to list. . . so Exhibit 5F, page 8 through 10. And with this residual functional capacity, could this person do any of [Plaintiff's] past relevant work?

(Tr. 57-58). In response, Dr. Stewart testified that the plaintiff could perform her past jobs as house cleaner, mobile home/office cleaner, cloth warehouse worker, fishing lure maker and kitchen helper (Tr. 54-58).

## ANALYSIS

The plaintiff alleges disability commencing January 1, 1996, due to depression, anxiety, panic attacks, arthritis in her feet, hips, and legs, problems with her shoulder and elbow, and migraine headaches. The ALJ found that the plaintiff had the residual functional capacity to perform work at all exertional levels with only simple instructions and no working directly with the general public, and could perform her past work (Tr. 18, 20). The plaintiff alleges that the ALJ erred by (1) failing to assess her mental impairments in the manner required by the regulations; (2) failing to properly evaluate her

residual functional capacity as required by Social Security Ruling 96-8p; and (3) failing to properly assess her credibility.

### Mental Impairments

The plaintiff first argues that the ALJ failed to assess her mental impairments in the manner required by the regulations. When there is evidence of a mental impairment that allegedly restricts a claimant's ability to work, the ALJ must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. §404.1520a. The regulations were amended on August 21, 2000, to provide that the five-point scale to rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), is: none, mild, moderate, marked, and extreme. *See* 65 Fed. Reg. 50774 (Aug. 21, 2000), 65 Fed. Reg. 60584 (Oct. 12, 2000). The regulations further provide for a four-point scale to rate the degree of limitation in the fourth functional area (episodes of decompensation), which is: none, one or two, three, four or more. *Id.* While the ALJ is no longer required to complete the PRTF (a mental assessment form that was previously attached to hearing decisions), he instead must "document application of the technique in the decision." *See* 20 C.F.R. §§404.1520a(e)(2), 416.920a(e)(2). The regulations now provide:

> At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2).

The plaintiff notes (pl brief. 6) that the ALJ did make a function-by-function assessment as set forth in the regulations (Tr. 16-17).  However, the ALJ did not explain his assessment and provide a rationale as to why the plaintiff's impairments were found to be moderate in each of the categories (pl. brief 6-7).  As set forth above, the plaintiff attended nine counseling sessions between July 2003 and October 2003 with counselor Catherine L. Ussery, M.A., L.P.C., who summarized on July 29, 2004, that over the course of the nine sessions, the plaintiff consistently reported increasing fear and panic symptoms while in traffic and in public places, as well as daily panic attacks.  Ms. Ussery indicated that the plaintiff showed short-term memory impairment at least once per session and displayed tangential speech.  She noted that it was unclear whether the plaintiff was taking her medications consistently.  Ms. Ussery assessed panic disorder with agoraphobia; major depressive disorder, moderate, recurrent; carpal tunnel syndrome; frequent headaches; psychosocial stressors; and a GAF score of 50.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (Tr. 207-208).

While the ALJ noted the GAF score, which supported a more restricted assessment than his, he failed to explain the consideration given to the assessment by the counselor in ranking the plaintiff's functional mental limitations.  The ALJ noted several times that the records indicated that the plaintiff did not appear motivated by her treatment (Tr. 16-17).  However, as argued by the plaintiff, that an individual with a diagnosis of panic disorder with agoraphobia anxiety disorder and major depressive order is not highly motivated should be expected (pl. brief 7).

The defendant argues that Ms. Ussery's opinions and assessments were inconsistent with those of three physicians, Drs. Floyd, Martin, and Eaker, and therefore

the ALJ did not give her assessment great weight (Tr. 18).  However, nowhere in his opinion does the ALJ say what his reasons were for finding the plaintiff had moderate mental limitations.  Accordingly, remand is necessary for a proper evaluation of the plaintiff's mental impairments that includes a review of the mental functioning assessments and consideration of the diagnoses of the plaintiff's counselor, including the weight accorded to her treatment notes and restrictions.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ failed to evaluate her residual functional capacity ("RFC") as required by Social Security Ruling 96-8p.  "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, *1. SSR 96-8p provides in pertinent part:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* *7.  Specifically, the plaintiff argues that the ALJ failed to properly consider her mental disorders in his analysis of her RFC.

The ALJ found that the plaintiff had the residual functional capacity to perform the physical requirements of work at all exertional levels and found that her mental restrictions would limit her to simple work that did not involve working directly with the public (Tr. 20).  The plaintiff alleged having several panic attacks per week (Tr. 51).  The plaintiff also complained of almost daily panic attacks to her counselor (Tr. 207), and a third party

15

witness stated that he had helped the plaintiff during a panic attack (Tr. 131-35).  Dr. Floyd noted in his evaluation that the plaintiff had tachycardia that "could very well be secondary to her anxiety" and she was noted to be very anxious during the examination (Tr. 155).  Dr. Martin also indicated that the plaintiff reported the attacks were brought on by "people, traffic, routine stresses at home, and attending doctors' appointments" (Tr. 158).  The plaintiff argues that the ALJ did not accept that she regularly has panic attacks because, if he had, the functional assessment would reflect the need for unscheduled work breaks, work absences, the need for work in a structured setting, or other restrictions reflecting the impairment.  The plaintiff further argues that the ALJ provided no information as to how he arrived at the conclusion that the plaintiff's conditions were manageable in a work setting as long as the plaintiff avoided complex tasks and the public (pl. brief 10-11).  Based upon the foregoing, remand is appropriate for consideration of the plaintiff's RFC with regard to the plaintiff's mental disorders with evidence of frequent anxiety attacks.

### *Credibility*

Lastly, the plaintiff argues that the ALJ failed to properly assess her credibility with regard to her mental impairments.  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to any subsequent reviewers the

16

weight the adjudicator gave to the individual's statements and reasons for that weight."
SSR 96-7p.

The ALJ states in his decision that the plaintiff's subjective allegations "far
exceed the limitations that would ordinarily be expected to result from the nature of her
impairments and far exceed the objective findings and observations which are reflected in
her medical records" (Tr. 18).  The ALJ also states that "[a]lthough the plaintiff testified that
she is unable to work, that allegation is not supported by the evidence in the record" (Tr.
17).  However, the only evidence cited by the ALJ as to the plaintiff's credibility is in regard
to her physical limitations rather than her mental limitations (Tr. 17).  As the ALJ failed to
provide an assessment of the plaintiff's credibility regarding her mental impairments, a
remand is necessary.  *See* SSR 96-7p.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's
decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause
to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

December 22, 2005

Greenville, South Carolina

17